# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ASAWIR ABDULHADI SFAIE AL ABDULRAHMAN,**

    **Plaintiff,**

    **v.**
                                              **Case No. 22-CV-768-SCD**

**COMMISSIONER OF THE**
**SOCIAL SECURITY ADMINISTRATION,**

    **Defendant.**

---

## DECISION AND ORDER

---

       Asawir Abdulhadi Sfaie Al Abdulrahman applied for social security disability benefits based primarily on an immune disorder that she says caused severe dryness in her eyes and mouth, persistent fatigue and joint pain, and cognitive difficulties. The commissioner of the Social Security Administration denied the application, and, after a hearing, an administrative law judge found Asawir capable of performing only a limited range of sit-down jobs. Asawir seeks judicial review of that decision, arguing that the ALJ erred in evaluating the severity of her immune disorder, assessing the intensity of her alleged symptoms, and determining her physical and mental abilities. I agree that substantial evidence does not support the ALJ's conclusion that Asawir's immune disorder failed to satisfy the requirements of a presumptively disabling impairment. However, because the record does not require a finding of disability, I will reverse the decision denying Asawir disability benefits and remand the matter for further proceedings, rather than order an award of benefits.

## BACKGROUND

In 2017, Asawir applied for supplemental security income under Title XVI of the Social Security Act, claiming that she became disabled and unable to work in February 2017 due to various physical and mental impairments.

### I. Medical Background

Asawir was born in Iraq in July 1990. R. 53–54.[1] After completing high school, she obtained an associate degree in accounting. R. 54–55, 255, 518, 560. She got married, gave birth to two children, and moved with her family to Wisconsin in 2014. R. 53–55, 1044. Asawir learned how to read and write in English, but she still speaks only Arabic. R. 85, 100, 147, 249, 251. She got a job as a cafeteria worker at her child's school; however, she could carry only light objects (at most ten pounds), and she missed a lot of work due to her various health problems. R. 251–52, 265–72, 297–304. Asawir stopped working the cafeteria job in December 2017 because she says the pain, lack of sleep, inability to stand, fatigue, stiffness, and swelling became unbearable.

After settling in Wisconsin, Asawir sought medical treatment for various physical ailments. In August 2016, she presented to a walk-in clinic complaining about low back pain that stemmed from a fall four years prior. R. 517–19. She was assessed acute right-sided low back pain and prescribed prednisone and ibuprofen. Asawir also saw a dermatologist for alopecia, an autoimmune disorder that causes hair loss. R. 412. After an antinuclear antibody test turned up positive, Asawir's dermatologist referred her to a rheumatologist for further evaluation of another possible immune disorder. At the initial consultation, Asawir reported

---

[1] The transcript is filed on the docket at ECF No. 10-2 to 10-10.

Case 1:22-cv-00768-SCD    Filed 09/11/23    Page 2 of 22    Document 26

joint pain in her lower extremities but no other symptoms. R. 412–15. The rheumatologist ordered an updated antibody test.

The updated test was positive for Sjogren's syndrome, R. 517, "an autoimmune disease affecting moisture-producing cells," *Tippitt v. Reliance Standard Life Ins. Co.*, 276 F. App'x 912, 913 (11th Cir. 2008). At follow-up visits in January 2017, Asawir reported several symptoms associated with the condition, including dryness in her eyes, mouth, and vagina; mouth sores; difficulty swallowing; joint pain; and moderate to severe fatigue. R. 408–11, 523–29. Her rheumatologist assessed "Sjogren's syndrome manifested by positive SSA, SSB antibodies, sicca symptoms,[2] arthralgias, [and] possible inflammatory arthritis of the left knee" and prescribed hydroxychloroquine. R. 410–11.

Asawir continued to complain about Sjogren's symptoms throughout 2017. *See* R. 398–11, 523–29, 533–42, 679–82, 697–99. She said that her medication helped initially but after a few months her symptoms worsened. Her rheumatologist instructed her to continue taking hydroxychloroquine and prescribed prednisone. In April 2017, Asawir's rheumatologist noted that the Sjogren's symptoms were "relatively well controlled" with medication. R. 403. Asawir indicated that she wanted to stop the medications because she and her husband wanted to have another child. In June 2017, the rheumatologist noted that, although Asawir did not have typical tender points during physical examinations, her symptoms appeared consistent with fibromyalgia. R. 400. The rheumatologist prescribed tramadol. A few months later, Asawir's OB/GYN recommended that Asawir restart hydroxychloroquine. R. 698–99. An eye exam in December 2017 revealed no vision concerns,

---

[2] The dryness features of Sjogren's syndrome are often referred to as sicca symptoms. *See Musonera v. Saul*, 410 F. Supp. 3d 1055, 1064 n.11 (E.D. Wis. 2019).

20/20 vision with correction, and unremarkable findings save for decreased tear film. R. 585–87. The optometrist recommended that Asawir try fish oil and water for her dry mouth and eye drops for her dry eyes.

In late 2017, Asawir was referred to neurology after complaining about dizziness, headaches, and frequently dropping heavy objects. *See* R. 384, 399, 596–98, 681–82. She reported sicca symptoms, generalized fatigue, and loss of strength at the initial evaluation. R. 597. The neurologist prescribed gabapentin and referred Asawir for diagnostic testing and occupational therapy. R. 598. The electromyography/nerve conduction study was negative for large or small fiber neuropathy. R. 591.

Asawir continued to seek treatment for Sjogren's syndrome and fibromyalgia throughout 2018. *See* R. 629–39, 663–76, 917–23, 949–55, 978–83, 1006–08. She reported ongoing symptoms of dry eyes and mouth, all-over body pain, and severe fatigue. In April 2018, the rheumatologist prescribed Cymbalta for Asawir's severe fibromyalgia. R. 675–76. Asawir returned to her rheumatologist a few months later complaining about significant abdominal pain, nausea, and vomiting. R. 671. The rheumatologist noted that Asawir had lost fifteen pounds in the last six months. She stopped Cymbalta and prescribed anti-nausea medication. At a follow-up visit in August 2018, the rheumatologist noted that Asawir's abdominal pain was better and that she was no longer losing weight. R. 668. Asawir also started seeing a pain management specialist and participating in physical therapy. She said that therapy provided some short-term relief, but she was still in pain, and she continued to drop things. R. 917, 949. Asawir stopped taking gabapentin in fall 2018 because she reported dizziness and falling on several occasions. R. 665, 886. In December 2018, Asawir indicated

4

that her pain was progressively worsening. R. 978. An eye exam later that month revealed no vision problems, and the optometrist had Asawir start prescription eye drops. R. 659–62.

Asawir's pain, headaches, and weakness persisted in 2019. *See* R. 1048–53, 1058–61, 1081–84. In March 2019, she reported having pounding headaches every few days. R. 1048. She was assessed with chronic migraines, prescribed migraine medication, and referred for Botox injections and physical therapy. R. 1052–53. The following month, Asawir said she was still in severe pain and having frequent migraines. R. 1058. In June 2019, Asawir reported decreased intensity and frequency of her headaches; however, she was still getting them about three days a week, she reported some dizziness, she didn't think physical therapy provided any significant lasting benefit, and she believed her memory was deteriorating. R. 1081. Notwithstanding her ongoing symptoms, Asawir generally exhibited intact extraocular muscles, moist oral mucosa without laceration, no swelling, good range of motion, and full motor strength during her physical exams. R. 398–11, 523–29, 533–42, 663–76, 679–82, 697–99, 917–23, 949–55, 978–83.

Asawir also received some medical attention for mental health issues. In October 2017, she was evaluated by Steve Krawiec, a psychologist paid by the Social Security Administration to conduct consultative psychological exams of disability claimants. *See* R. 559–61. Asawir told Dr. Krawiec that she applied for disability benefits due to complications from Sjogren's syndrome. She also reported mood and anxiety difficulty and indicated struggling with daily activities because of pain, weakness, and balance issues. Dr. Krawiec diagnosed major depressive disorder and specific phobias (being alone and in the dark). He believed that Asawir had adequate cognitive capacity to understand, remember, and apply information for simple jobs instructions; Asawir would not have any difficulty interacting with others; Asawir's mood

5

difficulty may interfere with persisting and maintaining pace; and Asawir would not have trouble adapting or managing herself.

Asawir also participated in individual psychotherapy as part of a comprehensive rheumatology treatment program. *See* R. 1001–46. During the initial evaluation in December 2018, she reported physical limitations and memory loss, loss of focus, a short temper, helplessness, loss of joy, loss of appetite, difficulty sleeping, and sadness related to her inability to interact with and care for her family. R. 1040–42. The therapist noted after several sessions that Asawir had a slightly irritable mood and a congruent affect. R. 1036, 1038. Asawir did not receive any other mental health treatment.

## II.    Procedural Background

Asawir applied for disability benefits in May 2017. *See* R. 227–34, 246–55, 256–64. She alleged disability beginning in February 2017 due to physical and mental problems. R. 246, 250. Asawir asserted that her impairments caused body pain, lack of sleep, swollen fingers and toes, chest pain, headaches, and joint pain. R. 256. She also asserted that her impairments significantly affected her daily activities. For example, she reported that she had difficulty with personal care and that her husband had to handle childcare, cooking, household chores, and shopping. R. 257–58. She also reported leaving the house only for doctor appointments and being unable to handle finances. R. 259–61. According to Asawir, her impairments significantly affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, remember, concentrate, understand, follow instructions, use her hands, and get along with others. R. 261. She estimated that she could pay attention for ten minutes, sit for fifteen minutes, stand for ten minutes, walk for ten minutes, and lift five pounds. R. 261–63.

6

The state agency charged with reviewing the application on behalf of the Social Security Administration denied Asawir's claim initially and upon her request for reconsideration. *See* R. 79–112. The medical consultants who reviewed Asawir's treatment records found that she had severe but not disabling fibromyalgia, Sjogren's syndrome, depression, and anxiety. R. 86, 103–04. The reviewing physicians found that Asawir could perform the full range of medium exertional work. R. 89–90, 93, 107–08, 111. As for mental functioning, the reviewing psychologists found that Asawir had a moderate limitation in her ability to concentrate, persist, or maintain pace. R. 86–87, 103–05. More specifically, they found that Asawir was moderately limited in her ability to sustain an ordinary routine without special supervision and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 91, 108–09. The reviewing psychologist at the reconsideration level found that Asawir was able to maintain attention, concentration, persistence, and pace for simple and detailed routine tasks for two hours at a time over a normal workday with normal supervision. R. 109.

After the state-agency denial, Asawir had a hearing with William Shenkenberg, an ALJ employed by the Social Security Administration. *See* R. 44–78. Asawir's lawyer noted that, although Asawir suffered from several physical and mental impairments, most of her issues related to Sjogren's syndrome. R. 48–52. In fact, her lawyer argued that Asawir's Sjogren's syndrome was presumptively disabling. The ALJ granted Asawir's lawyer permission to submit a post-hearing brief explaining how the disorder precluded Asawir from any gainful activity. R. 77; *see also* R. 352–55.

Asawir testified at the hearing through an interpreter. *See* R. 52–72. She told the ALJ that she was unable to work due primarily to Sjogren's syndrome and severe migraine headaches. R. 56–67. She said her Sjogren's syndrome caused extreme fatigue, severe joint pain, dry eyes and mouth, mouth sores, difficulty swallowing and talking, and difficulty concentrating and focusing. R. 56–65. According to Asawir, her fatigue had worsened so much over the last couple years that sometimes she spent the whole day lying down. She reported having blurry vision, daily pain in all her joints, numbness in her hands that resulted in her frequently dropping objects, and pain and numbness in her legs that caused daily instability. Asawir indicated that none of the medications she tried were very effective.

Asawir also testified about her daily activities. *See* R. 67–71. She said that her activity level varied depending on her symptoms—sometimes she did absolutely nothing, other days she could do simple household chores. She told the ALJ that her husband worked only part time so he could take care of their children, who were nine and six at the time of the hearing. She also told the ALJ that her kids learned how to help themselves, as she struggled caring for them when her husband wasn't home. Asawir indicated that, if she was having a really bad day, a neighbor friend would take the kids until her husband returned home from work. As for other activities, Asawir said she never left the house alone and she was no longer able to attend religious services due to pain and fatigue. She reported recently getting her driver's license; however, she said she didn't drive because she couldn't grip the steering wheel. According to Asawir, her husband handled all the grocery shopping and laundry.

The ALJ also heard testimony from William Dingess, a vocational expert. *See* R. 72–77. Dingess testified that a hypothetical person with Asawir's vocational profile could work as an assembler, an inspector, and a hand packager if she was limited to a restricted range of

8

sedentary work. R. 73–75. Dingess testified that no unskilled jobs would be available if the hypothetical person had to miss at least two days of work each month or was limited to only occasional handling, fingering, and feeling. R. 75–77.

In September 2019, the ALJ issued a written decision finding that Asawir was not disabled. *See* R. 22–43. The ALJ considered the disability application under 20 C.F.R. § 416.920(a)(4), which sets forth a five-step process for evaluating SSI claims. *See* R. 26–27. At step one, the ALJ determined that Asawir had not engaged in substantial gainful activity since her application date, May 22, 2017. R. 27. The ALJ determined at step two that Hatchett had five severe impairments: fibromyalgia, Sjogren's syndrome, migraines, depression, and anxiety. R. 27–28. At step three, the ALJ determined that Asawir did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in the social security regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 28–30. The ALJ considered Asawir's Sjogren's syndrome under Listing 14.10. R. 28.

The ALJ next assessed Asawir's residual functional capacity. The ALJ determined that Asawir could work at the sedentary exertional level with several additional limitations. R. 30–31. Specifically, Asawir could occasionally climb ladders, ropes, and scaffolds; she could frequently climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and handle, finger, and feel with her bilateral upper extremities; and she should avoid concentrated exposure to extreme cold and hazards like moving machinery and unprotected heights. As for mental abilities, the ALJ determined that Asawir was able to understand, remember, and carry out simple instructions and perform simple routine tasks and could perform low-stress work (defined as having only occasional changes in the work setting).

9

In assessing that RFC, the ALJ considered Asawir's subjective allegations about her impairments, the medical evidence, the prior administrative medical findings, and the medical opinion evidence. *See* R. 30–37. The ALJ determined that, although Asawir's physical impairments affected her ability to work, the objective medical evidence did not substantiate her allegations of disabling Sjogren's, fibromyalgia, and migraine symptoms. Similarly, the ALJ determined that the record did not substantiate disabling symptoms stemming from depression or anxiety. As for the opinion evidence in the record, the ALJ found somewhat persuasive the state-agency reviewing physicians' finding that Asawir could perform the full range of medium work, found the state-agency reviewing psychologists' findings overall persuasive, and found some persuasive value in the opinions of Dr. Krawiec.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Asawir did not have any past relevant work. R. 37. The ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Asawir could perform. R. 37–38. Relying on the vocational expert's testimony, the ALJ listed three representative jobs: assembler, inspector, and hand packager. Based on the step-five finding, the ALJ determined that Asawir had not been disabled since she applied for disability benefits. R. 38.

The Appeals Council denied Asawir's request for review, *see* R. 13–18, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

In July 2022, Asawir filed this action seeking judicial review of the Commissioner's decision denying her claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to

magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 5, 7, 8. Asawir filed a brief in support of her disability claim, ECF No. 15; Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, filed a brief in support of the ALJ's decision, ECF No. 24; and Asawir filed a reply brief, ECF No. 25.[3]

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, I must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834,

---

[3] Asawir did not seek permission to file her overlong reply brief, which is nearly fifty percent longer than this district's rules permit. *See* ECF No. 6.

837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Asawir's main argument is that the ALJ failed to properly consider her Sjogren's syndrome at step three of the sequential evaluation process. "At step three, the ALJ must determine whether the claimant's impairments are 'severe enough' to be presumptively disabling—that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary." *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020) (citing 20 C.F.R. § 404.1525(a)). "An impairment is presumptively disabling if it is listed in the relevant regulations' appendix, *see* 20 C.F.R. § 40.1525(a), or if it is 'medically equivalent' to a listing, *id.* § 404.1526(a)." *Jeske*, 955 F.3d at 588. Asawir maintains that the ALJ erred in finding that her Sjogren's syndrome did not meet the requirements of Listing 14.10. To meet a listed impairment, a claimant "must show that [her] impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)). "When evaluating whether an impairment is presumptively disabling under a listing, the ALJ 'must discuss the listing by name and offer more than a perfunctory analysis of the listing.'" *Jeske*, 955 F.3d at 588 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

The ALJ considered Asawir's Sjogren's syndrome under Listing 14.10, which describes two alternative paths to listings-level severity. *See* R. 28 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.10). Asawir challenges only the ALJ's decision that her Sjogren's syndrome did not meet the criteria of the first path, part A. *See* Pl.'s Br. at 4–15. Listing 14.10(A) has four criteria: (1) Sjogren's syndrome, as described in 20 C.F.R. Part 404, Subpart

12

P, Appendix 1, § 14.00(D)(7), with (2) "[i]nvolvement of two or more organs/body systems," (3) "[o]ne of the organs/body systems involved to at least a moderate level of severity," and (4) "[a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.10(A).

Asawir contends that the ALJ ignored significant evidence establishing that her Sjogren's syndrome satisfied each of the four criteria of Listing 14.10(A).

## I.   Sjogren's Syndrome, as Described in § 14.00D7

Section 14.00(D)(7) describes Sjogren's syndrome as "an immune-mediated disorder of the exocrine glands," with hallmark features of dry eyes and dry mouth. 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.00(D)(7)(a)(i). The disorder may also result in other complications, "such as corneal damage, blepharitis (eyelid inflammation), dysphagia (difficulty in swallowing), dental caries, and the inability to speak for extended periods of time." *Id.* And it may involve many other organs/body systems, including musculoskeletal, respiratory, gastrointestinal, genitourinary, skin, neurologic, mental, and neoplastic. *Id.* § 14.00(D)(7)(a)(ii). Individuals with Sjogren's syndrome frequently report severe fatigue and malaise. *Id.*

Asawir faults the ALJ for not mentioning section 14.00(D)(7) in his decision, for not acknowledging that Asawir's rheumatologist treated her autoimmune issues for months before diagnosing her with Sjogren's syndrome, and for ignoring evidence that Asawir's Sjogren's system was manifested by positive SSA and SSB antibodies, sicca symptoms, joint pain, and inflammatory arthritis. Although the ALJ did not explicitly discuss section 14.00(D)(7) in his decision, he did acknowledge that Asawir was diagnosed with Sjogren's syndrome, and he found Sjogren's to be a severe impairment at step two. *See* R. 27, 31. The ALJ also noted Asawir's various Sjogren's symptoms, including dry eyes and mouth, joint

13

pain, fatigue, mouth sores, difficulty swallowing, difficulty speaking, memory loss, and problems concentrating. *See* R. 28, 31–32. The ALJ therefore found that Asawir satisfied the first criterion of Listing 14.10(A).

## II. Involvement of Two or More Body Systems

Asawir argues that the ALJ failed to consider the involvement of multiple body systems. I agree. Asawir's attorney asserted at the administrative hearing that Asawir's Sjogren's syndrome affected her exocrine system, gastrointestinal system, neurological system, and skin system. *See* R. 49–52. The attorney also submitted a post-hearing brief explaining the evidence that supported the involvement of each of those body systems, as well as involvement of Asawir's mental system. *See* R. 352–55. Although the ALJ said he paid "particular attention" to the attorney's listing arguments, R. 28 (citing Exhibit 22E), he mentioned only two body systems in his step-three analysis: Asawir's sicca symptoms (i.e., the exocrine system) and the neurological system, R. 28. The ALJ did not consider whether Asawir's Sjogren's syndrome also affected her gastrointestinal system, skin system, or mental system despite evidence showing that the disorder caused difficulty swallowing, abdominal pain, nausea, vomiting, alopecia, vasculitis, and cognitive issues. *See, e.g.*, R. 401, 404, 523–29, 533, 559–61, 665, 668, 671, 964, 1040–43. Moreover, Kijakazi concedes that the ALJ did not consider Asawir's musculoskeletal system at step three. *See* Def.'s Br. at 9. The ALJ therefore did not meaningfully explain whether Asawir satisfied the second criterion of Listing 14.10(A). *See Raymond v. Comm'r of Soc. Sec.*, 357 F. Supp. 3d 232, 237–40 (W.D.N.Y. 2019) (remanding because an ALJ failed to address evidence showing that the plaintiff's Sjogren's syndrome affected multiple body systems).

### III. One Body System Involved To At Least a Moderate Level of Severity

The ALJ determined that the evidence failed to show the requisite level of severity of the involved body systems. R. 28. As for Asawir's sicca symptoms, the ALJ noted that objective examinations did not reveal any ocular damage caused by her Sjogren's medication and that Asawir treated her dry eyes with artificial tears. R. 28 (citing Exhibits 7F/7; 11F/51). The ALJ also acknowledged that, while Asawir claimed her prescription eye drops were ineffective, "she continued to be prescribed this medication without such complaints, suggesting it [was] at least somewhat effective." R. 28. And the ALJ observed that Asawir's dry mouth and swallowing difficulties were "generally controlled with hydration and mouthwash, with moist oral mucosa without ulceration found on examinations." R. 28 (citing Exhibits 2F/1, 4, 7, 11; 9F/18; 13F/14). The ALJ also noted that objective testing was negative for neuropathy. R. 28.

Asawir argues that the ALJ erred in finding that her sicca symptoms were not involved to at least a moderate level of severity. She says the ALJ failed to appreciate that her "aggressive and continuing treatment for her extreme sicca dry eye symptoms was patently required in an attempt to avoid permanent eye damage." Pl.'s Br. at 10 (citing R. 587). However, Asawir does not cite any evidence to suggest that her recommended treatment—applying artificial tear eye drops four times a day and drinking 1,000 to 2,000 milligrams of fish oil and 32 ounces of water each day—constituted "aggressive" treatment for her dry eyes and mouth. Nor has she cited any evidence to suggest that her dry eyes would lead to loss of vision or permanent eye damage if left untreated. Indeed, the treatment note Asawir cites indicates no vision concerns, her vision with correction was 20/20, and her eye exam was unremarkable aside from decreased tear film. *See* R. 586–87. The optometrist advised Asawir

to return to the office if her eye symptoms continued after four weeks, but Asawir waited a year before having another eye exam. *See* R. 659–62.

Asawir accuses the ALJ of ignoring other evidence of her sicca symptoms. For example, she says the ALJ didn't address her testimony that she wasn't able to see clearly and that her doctors wanted to operate on her tear canals. *See* R. 62. The record, however, contains very few complaints of blurred vision, *see* R. 756 (denying blurry vision), 865 (reporting some blurry visions that comes and goes), 921 (reporting blurred vision), 953 (denying blurry vison); never mentions the possibility of eye surgery; and supports the ALJ's conclusion that Asawir did not have significant vision problems, *see* R. 28 (citing Exhibits 7F/7 (unremarkable vision exam); 11F/51 (denying blurry vision)), R. 34 (citing Exhibit 9F/3 (unremarkable vision exam)). Asawir also says that she continued to battle dry eyes despite taking prescription eye drops. But the ALJ reasonably inferred that the eye drops must have been at least somewhat effective, as providers continued prescribing them. *See* R. 662, 1049, 1055, 1074, 1082, 1088. Finally, Asawir identifies records the ALJ failed to address where she reported mouth sores, dry mouth, and vaginal dryness. The ALJ, however, discussed Asawir's mouth issues and cited evidence showing those symptoms were not as severe as Asawir alleged. The ALJ therefore provided substantial evidence to support his conclusion that Asawir's sicca symptoms did not rise to a moderate level of severity.

Nevertheless, the ALJ failed to explain why the other involved body systems were not at least moderately severe. At step three, the ALJ did not address the severity with which Asawir's Sjogren's syndrome involved her musculoskeletal system even though the record showed the disorder resulted in inflammatory arthritis and ongoing joint pain. *See, e.g.*, R. 369, 399–406, 408, 411, 537, 581, 665–78, 700–01, 921, 964, 1006. Kijakazi maintains that

16

the ALJ made up for this error later in his decision when he cited evidence of negative diagnostic findings, lack of swelling, and relatively normal physical exams. *See* Def.'s Br. at 9–10 (citing R. 33, 35). However, the ALJ also assessed an RFC that includes several limitations of movements—sedentary work with additional postural and manipulative limitations—that implicate the musculoskeletal system. *See* R. 32–35. It's therefore unclear how severely the ALJ thought Sjogren's affected Asawir's musculoskeletal system.

Kijakazi also maintains that the ALJ indirectly accounted for the involvement of the musculoskeletal system via the state-agency reviewing physicians, as both doctors considered treatment records noting arthritis and joint pain and still found that Asawir did not meet or equal Listing 14.10(A). *See* Def.'s Br. at 10 (citing R. 80–112). The reviewing physicians, however, did not explain their listing finding, so it's not clear which of the four criteria they found lacking. Moreover, the ALJ found the reviewing physicians' findings only somewhat persuasive because the updated record showed increased symptoms, which the ALJ believed required additional limitations. *See* R. 35–36 (citing Exhibits 9F; 10F). He ultimately found Asawir capable of only a restricted range of sedentary work—a significant departure from the reviewing physicians' finding that Asawir could perform the full range of medium range. Thus, the ALJ's decision as a whole does clear up the severity of the involvement of the musculoskeletal system.

The record also contains evidence that the involvement of Asawir's mental system was at least moderately severe. Asawir asserted that her Sjogren's syndrome resulted in memory loss, difficulty concentrating, and depression symptoms. *See, e.g.*, R. 57, 261, 316, 559–61, 1040–46, 1081. The ALJ determined that depression and anxiety both were severe impairments; found moderate limitations in concentrating, persisting, or maintaining pace

17

and in adapting or managing oneself; and included several mental limitations in the RFC assessment. *See* R. 27–37. The ALJ, however, never addressed the severity of Asawir's mental impairments in relation to her Sjogren's syndrome.

Substantial evidence therefore does not support the ALJ's conclusion that the record failed to show the requisite level of severity of the involved body systems—the third criterion of Listing 14.10(A).

## IV.    At Least Two Constitutional Symptoms or Signs

The ALJ also determined that the record failed to show at least two constitutional symptoms or signs of Sjogren's syndrome. *See* R. 28. The ALJ observed that, while Asawir reported fatigue, the record generally did not contain reports of fever or general malaise, and physical examinations did not reveal significant objective findings. R. 28 (citing Exhibits 2F; 3F; 7F; 9F; 10F; 11F; 12F). As to involuntary weight loss, the ALJ observed that Asawir's weight did fluctuate by several pounds. However, according to the ALJ, "there [were] no periods of significant weight loss," and differences in Asawir's BMI were attributed to widely varying height measurements. R. 28 (citing Exhibits 2F/5; 9F/18; 10F/135; 13F/2).

Asawir does not present any evidence suggesting that she suffered from fever or malaise. Instead, she criticizes the ALJ for not explaining how those symptoms would be diagnosed by providers or reported by her because she does not speak English. Neither argument has merit. Anyone with a thermometer can diagnose a fever. Diagnosing malaise is a bit less obvious and more subjective. The Listings define malaise as "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.00(C)(2). Thus, it seems providers would note malaise based on a patient's reported symptoms or observations during

a physical exam. Asawir's treatment record reveals that, notwithstanding her limited ability to speak English, she was able to communicate with medical staff regarding her symptoms and concerns, sometimes with help from an interpreter. *See, e.g.*, R. 408, 517, 523, 533, 668. Asawir presents no reason to believe the language barrier impacted her ability to report a fever or general feelings of discomfort.

Asawir also argues that the ALJ ignored evidence showing that she suffered from severe fatigue. The Listings define severe fatigue as "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.00(C)(2). Asawir consistently reported that she did not engage in many activities due to persistent fatigue. *See, e.g.*, R. 56–57, 401, 412, 523, 597, 665, 668, 675, 694, 756, 806, 894, 897, 1006, 1013, 1041, 1054, 1062, 1071, 1085. The ALJ acknowledged Asawir's complaints of fatigue and seemed to accept that her fatigue was severe.

Kijakazi nevertheless contends that the ALJ made findings inconsistent with concluding that Asawir's fatigue met the severity requirements of Listing 14.10(A). Specifically, she says the ALJ determined that the extent of Asawir's reported symptoms was inconsistent with other evidence in the record, including the normal objective findings, Asawir's reported daily activities, and the medical opinion evidence. The ALJ, however, didn't mention fatigue as one of the symptoms he thought Asawir was exaggerating. *See* R. 31–35. Indeed, the ALJ explained that he limited Asawir to a restricted range of sedentary work in part to account for her subjective reports of fatigue. *See* R. 34. Moreover, in evaluating Asawir's subjective symptoms, the ALJ didn't explain how any of the objective findings he cited were inconsistent with severe fatigue. The ALJ also overstated Asawir's reported activities and over-relied on the fact that she was trying to get pregnant during the period she

19

claimed she couldn't work. Asawir consistently reported significant limitations with her daily activities, including needing a lot of help caring for her two children. *See* R. 67–71, 256–64, 311–18. And Asawir and her husband ultimately gave up on their desire to have another child, *see* R. 1048, likely due to her physical condition.

Finally, Asawir argues that the ALJ erred in finding that she did not experience any periods of significant weight loss. I agree. Although Asawir's weight fluctuated somewhat throughout 2017, it remained in the range of about 161 pounds.[4] However, by early April 2018, Asawir was down to 150 pounds. R. 673. A few months later, Asawir's weight caught the attention of her providers, as treatment notes showed she lost 15 pounds within the previous six months. R. 670–71 (weighing 145 pounds in June 2018). Asawir's weight remained in the 149-pound range throughout 2018 and 2019 despite her being very inactive and experiencing no significant changes to her diet or medication.[5,6] In fact, the few treatment records the ALJ cited reflect a 12-pound weight loss between April 2017 and June 2018. R. 28 (citing Exhibits 2F/5 (161 pounds in April 2017); 10F/135 (149 pounds in June 2018)). The ALJ, however, failed to explain why that period of involuntary weight loss was insignificant.

---

[4] November 2016: 164 pounds (R. 413), January 2017: 159 pounds (R. 159), February 2017: 157 pounds (R. 405), April 2017: 161 pounds (R. 402), June 3, 2017: 167 pounds (R. 385), June 22, 2017: 157 pounds (R. 543), September 25, 2017: 162 pounds (R. 699), September 29, 2017: 161 pounds (R. 696), November 8, 2017: 160 pounds (R. 761), November 14, 2017: 161 pounds (R. 774), November 21, 2017: 161 pounds (R. 596), and December 26, 2017: 161 pounds (R. 582).

[5] August 2018: 149 pounds (R. 666), November 2, 2018: 146 pounds (R. 642), November 7, 2018: 151 pounds (R. 663), November 30, 2018: 146 pounds (R. 654), December 6, 2018: 151 pounds (R. 151), December 27, 2018: 148 pounds (R. 993), March 2019: 148 pounds (R. 1056), April 2019: 152 pounds (R. 1067), May 2019: 152 pounds (R. 1076), July 8, 2019: 154 pounds (R. 1090), and July 23, 2019: 148 pounds (R. 54).

[6] Asawir did experience significant abdominal pain and vomiting after starting Cymbalta in April 2018. *See* R. 671–76. However, by that time Asawir had already lost 11 pounds in just over three months, and she never regained the weight after stopping Cymbalta or lost weight again after restarting the medication.

The ALJ also didn't consider the treatment records identified above showing a more precipitous and persistent drop in weight.

Asawir therefore appears to have satisfied the fourth criterion of Listing 14.10(A), as the record shows she experienced both severe fatigue and involuntary weight loss.

*       *       *

In sum, substantial evidence does not support the ALJ's conclusion that Asawir's Sjogren's syndrome did not meet the requirements of Listing 14.10(A). Asawir asks me to reverse the ALJ's decision and direct the Commissioner to find her disabled. "When a reviewing court remands to the Appeals Council, the ordinary remedy is a new hearing before an administrative law judge. In unusual cases, however, where the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits." *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018) (collecting cases). The record requires a finding of disability only when the evidence is so lopsided that it "can yield but one supportable conclusion"—that the applicant qualifies for disability benefits. *Martin*, 950 F.3d at 376 (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)). This is not one of those unusual cases. Although Asawir has identified some evidence that her Sjogren's syndrome meets each of the four requirements of Listing 14.10(A), the record is not so one-sided as to compel that finding. The appropriate remedy therefore is to remand, not to award benefits.

## CONCLUSION

For all the foregoing reasons, I find that substantial evidence does not support the ALJ's step-three finding regarding Asawir's Sjogren's syndrome. Thus, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for

further proceedings consistent with this decision. On remand, the Commissioner should also address Asawir's other claimed errors regarding her manipulative limitations; her moderate limitation in concentration, persistence, or maintaining pace; and the intensity, persistence, and limiting effects of her alleged symptoms. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 11th day of September, 2023.

STEPHEN C. DRIES
United States Magistrate Judge